COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

VERSUS

SANPLICE SIMIEN

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 20-K-4063-B
HONORABLE LAURA R. GARCILLE, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
CHIEF JUDGE

**********

Court composed of Elizabeth A. Pickett, Gary J. Ortego, and Clayton Davis, Judges.

AFFIRMED WITH INSTRUCTIONS.

Sherry Watters
Louisiana Appeal & Writ Service
P. O. Box 58769
New Orleans, LA 70158-8769
(504) 723-0284
COUNSEL FOR DEFENDANT–APPELLANT:
    Sanplice Simien

Chad Pitre
District Attorney, Twenty-seventh Judicial District
Kathleen E. Ryan
Assistant District Attorney
P. O. Box 1968
Opelousas, LA 70571
(337) 948-0551
COUNSEL FOR APPELLEE:
    State of Louisiana

**PICKETT, Chief Judge.**

## FACTS

On February 23, 2021, a grand jury indicted the defendant, Sanplice Simien, with two counts of first degree murder, a violation of La.R.S. 14:30. Additionally, he was charged with two counts of attempted first degree murder, a violation of La.R.S. 14:30 and 14:27. The defendant pled not guilty to these charges. On December 9, 2024, the state, by bill of information, charged the defendant with a third count of attempted first degree murder, to which he pled not guilty. After a mistrial due to jury contamination, a new jury trial began on March 17, 2025. On March 20, 2025, the jury found the defendant guilty as charged on all counts. On July 10, 2025, the trial court denied motions for new trial and post-verdict judgment of acquittal and sentenced the defendant.

For each count of first degree murder, the defendant received life imprisonment without benefit of parole, probation, or suspension of sentence. For each count of attempted first degree murder, he received thirty years without parole, probation, or suspension of sentence. These sentences were ordered to run concurrently. While the defendant made an oral motion for appeal, he never objected to his sentences or filed a motion to reconsider the sentences imposed. However, his oral motion for appeal was granted, and he lodged his appeal with this court on December 29, 2025.

## ASSIGNMENTS OF ERROR

In his appeal, the defendant asserts three assignments of error.

1) The trial court erred in proceeding directly to sentencing, without a waiver of delays, after motion for new trial was denied. Remand is required.

2) The State's circumstantial evidence failed to prove the defendant guilty beyond a reasonable doubt.

3) The trial court erred in finding the State's witness qualified as an expert in geo-positioning and allowing him to provide opinions as to the location of a phone at the time of the crime.

## **ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find one error in the minutes of sentencing and one error that is raised in an assignment of error and will be addressed as such.

The minutes of sentencing mistakenly refer to the fifth sentence imposed as a sentence on "Count 4." The minutes indicate that another sentence was already imposed on "Count 4." According to the sentencing transcript, the trial court imposed a sentence for "Count IV" and then proceeded to the sentencing of what it assumed was "Count V." The trial court recognized that "another bill" had been filed in the case. We note that a grand jury indictment was originally filed, charging the defendant with two counts of first degree murder and two counts of attempted first degree murder. Almost four years later, the state filed a bill of information charging the defendant with an additional count of attempted first degree murder. Although the additional count was not labeled "Count 5" in the bill of information, the trial court referred to it as such at sentencing. Thus, we order the trial court to correct the minutes of sentencing to indicate that the last sentence was imposed on "Count 5" instead of "Count 4."

Further, we find an error patent occurred when the trial court sentenced the defendant within twenty-four hours of denying his motion for new trial and motion for post-verdict judgment of acquittal. La.Code Crim.P. art. 873. Since this error has been raised by the defendant as an assigned error, we will it as such.

2

*Insufficiency of Evidence*

In his second assignment of error, the defendant contends the state's circumstantial evidence failed to prove that he was the perpetrator of the shooting, that he had specific intent to commit the crimes, and that he had intent to kill more than one person. According to *State v. Hearold*, 603 So.2d 731, 734 (La.1992), "[w]hen issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." Accordingly, we will address this assignment of error first.

*Legal Standard*

Louisiana Revised Statutes 14:30 defines first degree murder in pertinent part: "First degree murder is the killing of a human being…[w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." La.R.S. 14:30(A)(3). Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

When the sufficiency of the evidence is challenged on appeal, the standard of review is as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not

second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983). The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied*, 15-1151 (La. 5/13/16), 191 So.3d 1054.

A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson*, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. *See* La. Code Crim. P. art. 821(B); *State v. Ordodi*, 06-207 (La. 11/29/06), 946 So.2d 654, 660.

. . .

*State v. Coleman*, 17-1045, p. 6 (La.App. 1 Cir. 4/13/18), 249 So.3d 872, 877, *writ denied*, 18-830 (La. 2/18/19), 263 So.3d 1155.

*State v. Simmons*, 23-661, pp. 2–3 (La.App. 3 Cir. 3/20/24), 381 So.3d 1033, 1036–37, *writ denied*, 24-510 (La. 12/27/24), 397 So.3d 1221.

"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The rule does not apply when there is direct evidence, as explained in *State v. Lilly,* 468 So.2d 1154, 1158 (La.1985):

Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Austin*, 399 So.2d 158 (La.1981). Where there is direct evidence, the trier of fact weighs the credibility of evidence and the reviewer under *Jackson* defers to that trier of fact, assuming the proven facts most favorable to the State. Where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies.

In *State v. Bright*, 98-398, pp. 22–23 (La. 4/11/00), 776 So.2d 1134, 1147,[1] the supreme court discussed the law regarding identification:

When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. *State v. Smith*, 430 So.2d [31] at 45 [(La.1983)]; *see also State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of *Jackson v. Virginia*[, 443 U.S. 307, 99 S.Ct. 2781 (1979),] is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d [1305] at 1310 [(La.1988)].

*Evidence and Testimony*

**The Afternoon Altercation**

Emmerick Simon (M.C.) testified that on October 5, 2020, he and Michael Thomas went to the Morrow Projects. There they met Ladarius Leblanc (Mel), Vonderick Jimmerson (Kong), and Ladarius Keller (Gizmo), who were Mr. Thomas's cousins. Mr. Simon testified that when they arrived at the projects the defendant was there. Mr. Simon testified that he did not know the defendant well but would see him around from time to time. As he, Mr. Thomas, and the three

[1]The supreme court granted post-conviction relief on a *Brady* issue in *State v. Bright*, 02-2793 (La. 5/25/04), 875 So.2d 37.

cousins were hanging out in the parking lot, Mr. Simon said he saw a "little fuss" between Mr. Thomas and the defendant. Mr. Simon testified he was some distance away and was unable to tell why they were having the altercation. He said throughout the ten-minute exchange, Mr. Thomas and the defendant made no physical contact, and although Mr. Thomas had a gun in his truck, no guns were involved. The altercation ended without going beyond words according to Mr. Simon. Mr. Thomas and Mr. Simon returned to their truck, while the defendant returned to his vehicle. Mr. Simon, Mr. Thomas, Mr. Leblanc, Mr. Jimmerson, and Mr. Keller decided to go to a gym near the Morrow Projects to play basketball. Mr. Simon testified that, as Mr. Thomas was exiting the Morrow parking lot, Mr. Thomas and the defendant resumed their verbal altercation. This was the last altercation Mr. Simon said he remembered.

Vonderick Jimmerson (Kong) who was present in the Morrow Projects on October 5, testified that he saw the altercation between Michael Thomas and the defendant. Mr. Jimmerson said he arrived in Morrow in a Buick along with Ladarius Keller (Gizmo), Ladarius Leblanc (Mel), and Donterian Laws. He said Michael Thomas was in a tan Chevy truck with Emmerick Simon (M.C.). According to Mr. Jimmerson, the defendant arrived after they did. Mr. Jimmerson described the altercation, saying, "[Michael Thomas and the defendant] just got into it and passed words." Mr. Jimmerson said he was not close to the altercation. He said he was about the distance that separated the witness stand and the back of the courtroom. According to Mr. Jimmerson, after the two "passed words," the defendant drove off first, followed by Michael Thomas. He said he did not see any guns during the altercation.

The last of the surviving victims who testified was Ladarius Leblanc (Mel). Mr. Leblanc testified he was not familiar with the defendant but had seen him

around. He described the argument between the defendant and Michael Thomas as "nothing." There was no tussling or fighting, and Mr. Leblanc did not see any guns. He said "it was just a little argument."

Lindsey McKnight testified that the defendant is her cousin. She said he did not grow up in the local area but had been back for about two years. Ms. McKnight testified she was off work on October 5, 2020, and when her seven-year-old daughter arrived home from school she, her daughter, and her boyfriend, Terry Laws, all drove to the Morrow Projects to visit Terry's older son and grandchildren. Terry's son wasn't home, but his son's girlfriend and children were there. Ms. McKnight was outside while the children played together. The defendant was there when they arrived. Terry Laws was outside talking to the defendant while Ms. McKnight sat in the car. Ms. McKnight testified that she witnessed the altercation between Michael Thomas and the defendant. Her testimony was very different from the previous three witnesses. Ms. McKnight said that, while they were visiting outside the residence, Michael Thomas approached them, and that he was "fussing" and had a gun. She described the gun as a "big long gun" and said it was black. She testified Michael Thomas was in his truck, was "fussing" at the defendant, and pointed the gun out the window of the vehicle. Ms. McKnight said she did not know what was said—her focus was on getting her child in the car and leaving the area. She said Terry Laws was driving, and she and her daughter were passengers. She further testified her cousin, the defendant, left the projects first, her vehicle was behind the defendant's, and Michael Thomas was behind them in his truck. Ms. McKnight testified she went home to the Lebeau Projects.

Terry Laws testified that he, Ms. McKnight, and their young daughter went to the Morrow Projects on the day in question to visit his grandchildren. The

7

defendant was in the parking lot when they arrived. The two men began visiting in the parking lot. Mr. Laws said his grandchildren were running around playing. Mr. Laws testified that Michael Thomas pulled up in his truck. There was one person with him in the truck, but Mr. Laws did not know his name. Mr. Laws said the two men began "arguing" about "something that had went on a couple of days before[.]" Because he was worried about the safety of the children, he gathered up his grandchildren and put them inside. He said the defendant's truck door was open, and there was a pistol in the pocket of the door. He further testified that he did not see Michael Thomas with a gun. His focus was on getting the children inside. He then went straight to his car and left with Ms. McKnight and his daughter. Mr. Laws said he heard Michael Thomas, who he said is his cousin, tell the defendant "don't pull no gun on me, don't play with me with no gun." He did not testify that he saw anyone holding a gun. He said his focus was on his grandchildren. He saw the defendant and Michael Thomas leaving the projects when he did. He went home.

According to Ms. McKnight, after she and Mr. Laws arrived home, he left to carry a cousin to Opelousas to cash a check. Ms. McKnight testified that about an hour after she arrived home, the defendant came to her house in the Lebeau Projects. He knocked on her door then went back to his truck. She said when she went to the door he was already back in his truck with the truck door open. She walked out to the truck to talk to him. He asked her if she saw anybody pick up his money. She told him she didn't see any money. She testified that he told her "he lost fourteen hundred dollars when this was going on." The defendant then asked her, "do you know where Cook Street is?" He also asked where Mr. Laws was, and she told him he was in Opelousas. She said, "He was upset because of whatever— whatever had done already happen in Morrow. But his question of everything was

8

if I seen his money. If I seen anybody pick up his money." Ms. McKnight said she saw a gun in his lap and, once she realized he had a weapon, she went back inside. She said he didn't ask any questions about Michael Thomas; he just wanted to know where Cook Street was.

**After the Shooting**

Ms. McKnight said that about forty-five minutes later, Mr. Laws's mother called. She was upset and advised that her (Mrs. Laws's) nephew had been shot.

Mr. Laws testified that later on the evening of October 5, he was at his mother's house when the defendant called Mr. Laws's son. Mr. Laws said he took the phone away from his son to ask the defendant if he killed Michael Thomas. He said the defendant answered that he and his girlfriend were at home watching movies—then blurted out "something else" while he was hanging up the phone. Mr. Laws said he didn't catch what the defendant said.

**The Shooting**

After leaving the Morrow Projects, Mr. Simon, Mr. Thomas, Mr. Leblanc, Mr. Jimmerson, and Mr. Keller, as well as some other boys, went to a nearby gym and played basketball. They left the gym at sunset because it had no electricity.

Mr. Simon testified that when they left the gym he, Mr. Thomas, and perhaps Mr. Keller went straight to 157 Cook Street.

Cook Street is a solitary road off Highway 71 lying between Lebeau and Morrow, Louisiana. The property at 157 Cook Street was about an acre in size and had a trailer on it. The property was owned by Mr. Keller's uncle, but he had abandoned it.

Although they did not all arrive at 157 Cook Street in the same vehicle, once there, everyone was in Mr. Thomas's truck which he had parked in the driveway. Mr. Leblanc's vehicle was parked behind it. Testimony established that Michael

Thomas was sitting in the driver's seat, Mr. Simon was in the front passenger seat, Mr. Jimmerson was in the back seat on the right-hand side, Mr. Keller was in the back middle seat, and Mr. Leblanc was in the back seat on the left-hand side. The vehicle was backed into the driveway and turned off. The men were smoking marijuana.

Mr. Simon testified that there were two guns in the car. One belonged to Mr. Thomas, and the other – a pistol – belonged to Mr. Jimmerson. Mr. Simon testified he was sitting in the front passenger seat as they rolled their cigarettes. A few minutes passed. Then, from the front of the truck, shots went off. Mr. Simon was wounded in the arm, chest, back, and hand. He abandoned the vehicle and ran towards Highway 71. Mr. Simon testified his vision was "blurring," but when he turned, he saw the shooter, with a pistol in each hand, chasing, shooting, and cursing at him.

When asked whether he identified the shooter, Mr. Simon responded, "It was dark." Mr. Simon testified he evaded the shooter by running into the woods. Once he determined the shooter had gone away, Mr. Simon returned to the vehicles at 157 Cook Street. The state asked Mr. Simon if he told the guys in the truck that the shooter was the defendant, and Mr. Simon said, "No, I didn't say nothing [sic]." Then, the following exchange took place:

Q.    [THE STATE]: You didn't say nothing?

A.    [EMMERICK SIMON]: No.

Q.    Okay. So you're looking at him [the defendant] in court right now, you don't recognize him?

A.    Yeah, I recognize him.

Q.    Where do you recognize him from?

A.    I seen him.

Q.    Where you saw him?

A.    That day in the projects, when all that stuff was going on.

Q.    Okay. Did you see him again that night?

A.    I "ain't" going to say I seen him, but it had to be him.

Q.    And why you think that?

A.    Because of the way he was talking to me.

Q.    Did you recognize his voice?

A.    Yep.

Q.    How far was he from you?

A.    Probably from where I'm sitting, where he's sitting.

Q.    And did you stumble or fall or anything at any point?

A.    Yeah, I fell.

Q.    Tell me about that.

A.    And when I got off the street, I "turnt" towards the wooded area. I don't know I fell, and I "turnt" over and I seen he kept running towards the highway, so I just got up.

Q.    Where did you go?

A.    I went back towards the truck.

Q.    So you saw him running -- running past you?

A.    Yeah, I seen that.

Q.    Okay. And you -- do you remember what he was wearing?

A.     It was a hoodie. It was all black.

Q.    Okay. When he passed you, you didn't recognize him?

A.    No verbal response.

Q.    You didn't see -- you didn't see his face?

A.    I was a good bit away. But. . . .

Q.    Is that him?

. . . .

A.   It had to be him.

However, when Officer Greg Leblanc questioned Mr. Simon at the hospital that night, Mr. Simon was not entirely honest in answering. He never told Officer Leblanc that Mr. Jimmerson was among those in the truck. Also, he claimed there was a man named "Tex" who was with them at Cook Street, which was not true. Mr. Simon substituted "Tex" for Mr. Jimmerson, and this was confirmed by Officer Leblanc during cross-examination. Explaining himself, Mr. Simon testified he was trying to protect Mr. Jimmerson because he knew Mr. Jimmerson was "into some stuff." Mr. Simon also never told Officer Leblanc about the defendant.

The state specifically asked:

Q.   Okay. And at the time that you spoke to officer Leblanc, you didn't say the name Sanplice?

A.   No.

Q.   Why not?

A.   I guess I was scared, I mean, I was young. I'm still scared to this day. I mean . . .

Q.   What are you scared about?

A.   I been shot six times.

Additionally, on direct examination, the state had Simon review the security footage noted above from a nearby store:

Q.   Do you recognize this area?

A.   Yeah.

Q.   And if you could tell us what this -- what do you recognize in this? Where are we?

A.   We're looking at Cook Street.

Q.   That's Cook Street over there by that lit up light in the back?

A.     Yeah.

Q.     Okay, I'm going to fast forward to just the time frame I want to look at. So that -- right as you get up to 8:00 [P.M.] and that light, I'm going to play it and see – a couple of questions.

       [Whereupon the surveillance video was played, after which the following proceedings were had:]

**CONTINUED BY MS. GOTHREAUX:**

Q.     You see that figure walking in the back?

A.     Uh-huh.

Q.     Okay. This TV by me it's a little bit better actually, but -- do you recognize that person?

A.     No verbal response.

Q.     Not sure?

A.     I'm not sure.

Q.     I'll move you a couple of -- couple minutes down.

       . . .

Q.     Right as it hits -- hits 8:03, I want you to watch by the woods to your left.

       . . .

Q.     You see some movement?

A.     Yeah, I see it.

Q.     Top left, you see that?

       [Whereupon the surveillance video was played, after which the following proceedings were had:]

**CONTINUED BY MS. GOTHREAUX:**

Q.     You see that person in the background?

A.     Uh-huh.

Q.     Who is that?

13

A.      No verbal response.

As Mr. Simon made this non-verbal response, the state asked for the record to reflect that Mr. Simon was pointing to the defendant.

On cross examination, Mr. Simon testified about his interview with police occurring on October 6, 2020, the day after the shooting. In his interview, he told the officers that during the altercation between the defendant and Michael Thomas in Morrow, the only voice he could hear was Michael Thomas's voice. Also, he said that when the boys were in Michael Thomas's truck on Cook Street, they were playing with Mr. Jimmerson's pistol. Consequently, when gunfire began, Mr. Simon thought the gun went off in the car. Regarding the identity of the shooter, he told the police, "[I]f I seen the dude's face, I would recognize -- I wouldn't recognize him, I didn't recognize his voice, it was an old man . . . . I swear to God I wish I knew who it was." Additionally, Detective Leblanc testified that during this interview, Mr. Simon kept calling the shooter "old man" because of the shooter's choice of words like "y'all little ninjas." In his February 11, 2021, interview with police, Mr. Simon claimed a man named "Weedy" was with them, but Mr. Simon testified at trial "[t]hat must have been a lie." While recounting the shooting in this interview, Mr. Simon said the shots had come from the road. When Mr. Simon looked at the shooter, his eyes were a "little watery," but he saw a figure wearing all black clothing and a mask. Lastly, regarding the defendant's voice during the Morrow argument, Mr. Simon said the only thing he could remember about it was that it sounded like a man's voice.

On re-direct, the following exchange between the prosecutor and Mr. Simon occurred:

Q.      We all just went through those two videos and you heard everything you said in those videos. What is the truth?

A.  No verbal response.

Q.  I mean, you know what the question is, what is the truth?

A.  What you need to ask me?

Q.  Did you see this man [the defendant] on Cook Street when y'all got shot?

A.  I recognize him.

Q.  Was that the man on the street with two guns?

A.  Could have been.

Q.  Could have been. Why you say it like that?

A.  (Unintelligible) I feel like that was him.

Q.  You feel like it was him?

A.  No verbal response.

Q.  Now when you were talking to the police, were you purposely not telling them that?

A.  Yeah, I was lying.

Q.  Why?

A.  I was scared. I "ain't" want to deal with that at the time. I "ain't" think was going to be into all that. So, I "ain't" going to deal with that, I was trying to get away from that.

Q.  Why today -- why today are you telling us this, why now?

A.  Even today, it was like a few weeks ago, I mean, been thinking about this ever since I started coming to talk to y'all.

Q.  Yeah, you talked to me before, right?

A.  Right.

Q.  What did I ask you to do?

A.  Tell the truth.

Q.  Did I ever ask you to do anything other than tell the truth?

A.  No.

15

Q. You're telling the truth today?

A. Yes.

Q. This man right here, Sanplice Simien, this is the man that shot you and your two friends?

A. Yes.

Mr. Jimmerson testified about the events surrounding the shooting. He said the boys were in Michael Thomas's truck to hang out and smoke. Mr. Jimmerson said that Michael Thomas had his "long gun" with him. To Mr. Jimmerson, about an hour passed before the shooting occurred. "We was just 'chillin,'" he testified, "and then gunfire." Mr. Jimmerson testified that he ducked. "Then after that, like, basically we got out and we was like, what happen, where it coming from? And M.C. [Emmerick Simon] came back and told him, like, he gone or whatever. I'm like, who you talking about? And I guess he was referring to Sam."

Q. M.C. told – told you it was Sanplice?

A. Yes ma'am.

. . . .

Q. Say it again.

A. I say because M.C. got out of the truck and ran. So, when he came back he was like, he gone.

Mr. Jimmerson testified that he remembered the defendant from earlier in the day. He did not see the defendant on Cook Street the night of the shooting himself, but he remembered Mr. Simon saying the defendant's name.

On cross-examination, Mr. Jimmerson testified that he was interviewed by the police on February 9, 2021. By then, Mr. Jimmerson was incarcerated. During his interview, Mr. Jimmerson told the police that the boys smoked for fifteen to twenty minutes. Then the shooting happened, and shots came from the driver's side. Mr. Jimmerson said he did not see anybody approaching the vehicle. It was

dark. The streets were not well lit. After the shooting, the boys got out of the vehicle. Emmerick Simon ran and was shot. Once Mr. Simon returned, Mr. Jimmerson rode with him, Ladarius Keller, and Abigail Lastrapes to the hospital. Mr. Jimmerson testified on cross that though he saw the altercation between the defendant and Michael Thomas, he never heard the content of the dispute. He described the defendant as a tall and light-skinned guy.

Mr. Leblanc's testimony regarding the shooting was very emotional and tended to be nonresponsive on both direct and cross-examination. In sum, he testified that he was ducking and did not see who the shooter was on Cook Street the night of October 5, 2020.

Abigail Lastrapes, Mr. Keller's mother, lived at 167 Cook Street, immediately down the road from the crime scene. She testified that around 8:00 in the evening of October 5, 2020, she heard gunfire coming from the property owned by her brother. Mr. Simon, having returned to the truck after the shooter left, ran to her house and told her that her son, Ladarius Keller, had been shot. She called 911 and drove Mr. Keller, Mr. Simon, and Mr. Jimmerson to the hospital. Despite receiving emergency care, Mr. Keller died that night. Michael Thomas died at the scene.

Lieutenant Steven Hidalgo, of the St. Landry Parish Sheriff's Office, was the first officer to reach 157 Cook Street. Lieutenant Hidalgo testified he arrived at around 8:15 P.M. There, in the driver's seat of a vehicle, he found Michael Thomas's body and met another victim, Ladarius Leblanc, who was near the vehicle and was distraught. The lead investigator, Detective Graig Leblanc, arrived at around 8:40 P.M. As he photographed the area, Detective Leblanc collected bullet casings which belonged to two different firearms. These casings were found on the driveway of 157 Cook Street and on the roadway near 144 Cook Street.

Some were 9mm caliber while others were .40 caliber. Additionally, Detective Leblanc collected projectiles from the wrist and head of Michael Thomas and from the right shoulder and back of Ladarius Keller. On cross examination, Detective Leblanc testified that, because there were two different calibers, the shooter must have used two different guns, especially since the two different caliber casings were found in the driveway on the driver's side of Michael Thomas's vehicle. Detective Leblanc also believed the 9mm casing found by 144 Cook Street was connected to the homicide. These items were examined by Steven Richardson, an expert in firearm identification working for the Acadiana Crime Lab. According to Mr. Richardson, all the 9mm cartridge casings and bullets found at the scene were all fired from the same weapon. Likewise, all the .40 caliber casings were fired from the same weapon. The specific manufacturer and model of the weapons could not be determined. Moreover, without having the shooter's firearm, Mr. Richardson could not determine whether there was a positive association between these casings and the bullets collected from the scene. Also, Chau Nguyen, a forensic DNA analyst, examined these items and was unable to draw from them any DNA profile.

In addition to the casings and bullets, Detective Leblanc collected surveillance footage from nearby traffic cameras covering Highway 71, as well as from the cameras belonging to a store near the Morrow Projects called Ewing's Grocery. Some of these cameras were close to Cook Street. During Detective Leblanc's testimony, this footage was played to the jury. Detective Leblanc testified that from the Channel Five camera, at around 7:54 P.M., one can see Ladarius Leblanc's vehicle turn onto Cook Street and head towards the crime scene which was off camera. At around 8:00 P.M., Michael Thomas's truck arrives. Detective Leblanc testified that not long after this you see "the shadow of

18

an individual" walk across the street, but "you won't be able to make out anything about the individual." Also, on the Channel Two camera, at 7:59:46 P.M., the shadow can be seen again, walking through the back of a residence, but the individual is still impossible to identify. Then, at around 8:03 P.M., the video shows some "shadows" starting to move, and a shot and flash appear. As Detective Leblanc described it:

> It was a shot indicating that some shooting occurring [sic] and there's two men. There appears to be one running, one went down, one stopped running here, for whatever reason at this point, and then look here, you see a individual running off Cook Street.
>
> . . . .
>
> You can see through here, cause there's gaps in the tree, so you see -- you see some shooting, or a shot. You see one individual stop for whatever reason, and then you see the other shadow keep running.

Two phones, both found in Michael Thomas's vehicle, were also collected. Though there is no indication that any phone belonging to the defendant was collected at or near the crime scene, the defendant's phone – a Samsung GSM – was also collected once he became a suspect. The AT&T call data relating to the defendant's phone number was collected as well. Shane Garrard, the Chief Information Officer at the St. Landry Parish Sheriff's Office, was accepted as an expert in cell phone extraction and in call detail record mapping and analysis. In part, Mr. Garrard's testimony concerned the extraction report of the defendant's Samsung phone. According to Mr. Garrard, however, the only thing interesting about this phone was that it was never mentioned in the records relating to the October 5, 2020 incident. In fact, only the defendant's phone number bore any relation to that date. In a separate report called a "detail mapping" report, a cell phone with the defendant's phone number was shown to have been in the area at the time of the shooting, but not the Samsung phone the police recovered from the

defendant at the time of his arrest. This discrepancy meant to Mr. Garrard that the SIM card relating to the defendant's phone number was inserted into another device other than the Samsung phone on October 5, 2020. He testified he saw this issue arise in other cases "where the mobile device, the SIM card is taken out, and put in another device, so that in the event that a device is found, it doesn't have the data or anything like that." Mr. Garrard found it noteworthy that the defendant's Samsung phone "had no data prior to the initial use of this phone, which was after October 5th."

Before discussing the specifics of the detail mapping report, Mr. Garrard noted, "[I]n this case in call detail records mapping and analysis, we do not say -- you will never hear me say . . . that a person was at point A or B." Instead, one can say that "[t]hey were in the vicinity and this direction of the tower." Mr. Garrard explained that, in general, when it comes to mapping, towers are three-sided, and on each side, there is a triangle which activates as one moves around the tower. Since towers are expensive to build, the cell phone carriers try to "stretch the use of a cell tower as much as possible." In a rural area like Morrow, there is no need for multiple cell towers, and in the defendant's case, the mapping primarily, if not completely, relied on three towers: one in Morrow, one off Highway 71 and just south of Cook Street, and one near Lebeau. For reference, Mr. Garrard testified that the distance from Morrow to Cook Street was 4.47 miles. It was 4.53 miles from Cook Street to Lebeau, and from Lebeau to Morrow was 9.03 miles.

Mr. Garrard testified that on October 5, at 5:30 P.M., the defendant's phone activated a cell tower in Morrow. After which, there was about an hour's worth of activations. At 6:47 P.M., the defendant activated the same tower but from the direction of the Morrow Projects. At around 7:37 P.M., the defendant activated the tower located northwest of Lebeau, which, according to Mr. Garrard, was the

tower closest to Cook Street. Again, the map on this exhibit shows this tower was off Highway 71 and just south of Cook Street. At 7:44 P.M., the defendant received a text message which activated the same tower.

Not long after the shooting, specifically at 8:17 P.M., the defendant's number activated the tower just south of Cook Street. From that point forward, Mr. Garrard testified that the defendant's number activated towers along Highways 71 and 190, heading in the direction of Baton Rouge. The last activation occurred at 9:14 P.M., Mr. Garrard testified. By then, the defendant's number was activating the towers found in Baton Rouge proper.

However, some caveats to this information were provided during cross-examination. Here, Mr. Garrard testified that the position of the phone cannot be determined based on call detail records, but what they do show is that the phone is in a certain sector. Moreover, the cell site servicing the phone is not always the closest cell tower, and it is possible for a moving phone to be past the tower before the connection switches.

**Discussion**

Sanplice Simien was tried before a jury and found guilty of the first degree murders of Michael Thomas and Ladarious Keller. He was also convicted of the attempted first degree murders of Emmerick Simon, Ladarius Leblanc, and Vonderick Jimmerson. The elements for these offenses are set forth above. The question for this court, as to the two charges of first degree murder, is whether the evidence, viewed in a light most favorable to the prosecution, is sufficient for any rational trier of fact to find the defendant killed both Michael Thomas and Ladarious Keller, and that at the time he committed the offense he had a specific intent to kill or to inflict great bodily harm upon more than one person. *Kennerson*, 695 So.2d 1367; La.R.S. 14:30. The same standard of review applies to the three

counts of attempted first degree murder with the notable exception that there must be sufficient evidence of the specific intent to kill. La.R.S. 14:27(A).

After reviewing the totality of the evidence presented, we conclude it is sufficient, when viewed in a light most favorable to the prosecution, for a reasonable trier of fact to find beyond a reasonable doubt that the defendant committed these offenses.

The defendant argues the evidence is all purely circumstantial, and insufficient to place the defendant at the scene of the crime. A great deal of the evidence is, in fact, circumstantial. The evidence is, however, compelling.

The evidence establishes an altercation took place between the defendant and one of the victims at the Morrow Projects the afternoon of October 5, 2020. An hour or so later, the defendant went to the home of Ms. McKnight, who had witnessed the altercation in Morrow, and asked if she had seen anyone pick up his money. He was upset and told her he was missing $1,400.00. She had no knowledge of the missing money. He also asked her "do you know where Cook Street is?" He had a gun in his lap as he sat in his truck. Approximately forty-five minutes later, she received a phone call from a relative advising her of the shooting on Cook Street. The testimony regarding the proximity of the defendant's cell phone to the cell phone towers, while not specific enough to place him at the scene, places his phone in the area both before and after the shooting. When Mr. Laws spoke to him on the phone after the shooting and asked the defendant if he killed Michael Thomas, the defendant stated he was home with his girlfriend all night watching movies. The tower data shows that his phone was not at home all night, and, at the time he was making that statement, was hitting towers in the Baton Rouge area.

22

Further, Mr. Simon identified the defendant as the shooter. Eyewitness identification is considered direct, and not circumstantial evidence. *See Lilly*, 468 So.2d 1154. Mr. Simon said when the shooting started, he ran. He turned and saw the shooter, with a pistol in each hand, chasing, shouting and cursing at him. He testified he recognized the defendant's voice. He said as he ran from the scene he fell. The shooter ran past him. He then ran back to the vehicle. When he arrived back at the vehicle, he told Mr. Jimmerson the shooter was the defendant and he was gone. When asked if Mr. Simon told Mr. Jimmerson it was Sanplice, he answered "Yes Ma'am."

In the statements Mr. Simon gave to the investigating officers the night of the shooting, and in follow-up interviews, he denied being able to identify the shooter. He told them it was dark, the shooter was dressed all in black, he had a mask, and he couldn't see well through watery eyes. At trial, Mr. Simon admitted the night of the shooting he had lied to the police. He testified that he lied because he was scared. He said he was young and he is still scared today because he was shot six times. At trial, he identified the defendant as the shooter.

Physical findings corroborate aspects of his testimony. He said the shooter had a gun in each hand. The bullet casings at the scene were from two separate guns. No guns were recovered. He said he ran from the scene and fell as he was running, at which time the shooter ran past him. This scenario is reflected in the video from the convenience store which shows two people running from the scene. One drops to the ground. The other runs off. While no one can identify those two people from the video itself due to the quality, Mr. Simon knows, since he is the individual who "drops," that the shooter is the man who runs past him.

The fact finder, in this case the jury, is tasked with making credibility determination. It is clear the jury believed Mr. Simon's trial testimony. We will not

disturb that credibility determination. *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, *cert. denied*, ___ U.S. ___, 142 S.Ct. 1702 (2022).

Regarding the issue of specific intent, there is clearly specific intent to kill when an individual shoots at five people who are seated in a vehicle, inflicting multiple gunshot wounds to three of the occupants. That element was proven by the very actions of the defendant.

When viewing the evidence in light most favorable to the prosecution, we find sufficient evidence that all elements of these offenses were established beyond a reasonable doubt. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant assigns as error that the trial court sentenced him within twenty-four hours of denying his Motion for New Trial, thereby violating La.Code Crim.P. art. 873. The defendant further alleges that since he did not explicitly waive the delay, his sentence must be vacated and the case remanded for resentencing. In response, the state acknowledges there was no express waiver of the twenty-four-hour delay but argues the error is harmless.

*Proceedings in Trial Court*

After the defendant was convicted on March 20, 2025, sentencing was originally set for May 8, 2025. Sentencing was refixed for June 12, 2025, however, because the defendant filed a motion for a Pre-Sentence Investigation (PSI) report. On June 6, 2025, the defendant filed a Motion for Post-Verdict Judgment of Acquittal and a Motion for New Trial. In both motions, the defendant stated that sentencing was scheduled for June 12, 2025, and asked for his post-trial motions to be heard on June 12, 2025. Although the parties appeared on June 12, 2025, the matter was reset to July 10, 2025, to allow the state more time to respond to the defendant's post-trial motions.

24

On July 10, 2025, the trial court heard arguments and denied the defendant's Motion for Post Verdict Judgment of Acquittal and Motion for New Trial. The trial court immediately stated that it was ready to proceed with the defendant's sentencing. Defense counsel responded, "And just note our objection, Judge, for the record."[2] The trial court then stated:

> Let the record reflect that Mr. Simien is present in court with his attorney, Mr. Pontiff. Mr. Simien, you are found guilty by unanimous jury on March 20th of 2025, with the charges of two counts of first degree murder and three counts of attempted first degree murder. Under the laws of Louisiana, there's three days to delay before sentencing. Sentencing was set for today and we're here for sentencing this morning. Let the record reflect that he is present with his attorney and this is a victim's rights case. So at this time if the family members are present, they're allowed to move forward with their statements.

The trial court heard several victim impact statements as well as a statement by the defendant. The trial court then sentenced the defendant to life in prison without benefit of parole, probation, or suspension of sentence for each count of first degree murder (counts one and two) and to thirty years at hard labor without benefit of parole, probation, or suspension of sentence for each count of attempted first degree murder (counts three, four, and five). The sentences were ordered to run concurrently. After the sentences were imposed, the trial court filed the PSI under seal. The defendant asserts in brief that no objection was made to the sentences and no motion to reconsider sentence was filed.

*Law and Analysis*

This court recently analyzed this issue as follows:

> The trial court sentenced Defendant on October 28, 2024, shortly after denying his motion in arrest of judgment and for new trial. Louisiana Code of Criminal Procedure Article 873 provides:

---

[2]Although it is not clear from the record, the defendant does not suggest in this court that his trial counsel's objection was in reference to the failure to delay sentencing rather than the trial court's denial of his post-trial motions.

If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied*, 583 U.S. 1160, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018), the supreme court found that the La.Code Crim.P. art. 873 waiver must be express, not implicit. Distinguishing between the two types of waivers, the court explained that merely participating in the sentencing hearing would be considered an implicit waiver. Although announcing a readiness for sentencing has been considered an implicit waiver by some appellate courts, the supreme court explained that, under the circumstances of those cases, such a waiver should really be considered an express waiver. Subsequently, in *State v. Boyd*, 17-1749 (La. 8/31/18), 251 So.3d 407, the supreme court found an express waiver was made when the defense responded that it had no objection to proceeding with sentencing.

In the absence of a waiver, the supreme court made it clear in *Kisack*, 236 So.3d 1201, that an Article 873 violation may still be considered harmless. This court recently addressed the issue in *State v. Toby*, 22-386, pp. 19-20 (La.App. 3 Cir. 3/8/23), 358 So.3d 289, 304, *writ denied*, 23-491 (La. 12/5/23), 373 So.3d 714:

> Prior to the supreme court's ruling in *Kisack*, "errors in failing to observe La.Code Crim.P. art. 873's mandatory sentencing delay were found harmless where a mandatory life sentence was imposed or when the defendant did not challenge his sentence on appeal and did not claim prejudice due to the lack of the delay." *State v. Holden*, 19-867, p. 8 (La.App. 3 Cir. 7/15/20), 304 So.3d 520, 525, *writ denied*, 20-1016 (La. 2/9/21), 310 So.3d 174. Since *Kisack*, courts have continued to find harmless error where a mandatory life sentence is imposed or where the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. *See State v. Deville*, 22-317 (La.App. 3 Cir. 10/19/22), 349 So.3d 1158; *State v. Williams*, 20-605 (La.App. 3 Cir. 11/3/21), 329 So.3d 938, *writ denied*, 21-1798 (La. 4/12/22), 336 So.3d 85; and *State v. Chester*, 19-363 (La.App. 5 Cir. 2/3/21), 314 So.3d 914, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. In the present case, the defendant neither challenges the sentences imposed nor claims he was prejudiced by lack of a delay. Thus, we conclude the error to be harmless under these circumstances.

> *See also*, *State v. Hills*, 23-629 (La.App. 3 Cir. 4/3/24), 387 So.3d
> 702, *writ denied*, 24-658 (La. 1/14/25), 398 So.3d 648.
>
> In the present case, a mandatory life sentence was imposed, and
> Defendant does not challenge his sentence on appeal. Thus, we find
> that the trial court's failure to abide by the La.Code Crim.P. art. 873
> delay was harmless.

*State v. Gullette*, 25-152, pp. 3–4 (La.App. 3 Cir. 11/5/25), 423 So.3d 1231, 1234.

In the present case, there was no mention of a waiver of the Article 873 delay, and nothing said by defense counsel at sentencing would be considered an express waiver under *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied*, 583 U.S. 1160, 138 S.Ct. 1175 (2018), or *State v. Boyd*, 17-1749 (La. 8/31/18), 251 So.3d 407. Thus, we must determine whether the lack of delay was harmless error in this case.

As noted by this court in *Gullette*, even after *Kisack*, courts have continued to find harmless error where a mandatory life sentence was imposed or where the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. In the present case, two mandatory life sentences were imposed along with three non-mandatory sentences. All the sentences were ordered to run concurrently. Although the defendant assigns the lack of delay as an error, he does not allege any prejudice because of the lack of delay and does not challenge the sentences imposed.

Clearly the above jurisprudence indicates the lack of delay in the present case should likewise be considered harmless error. Although the defendant received three non-mandatory sentences, those sentences were ordered to run concurrently with two mandatory life sentences. Furthermore, even though the defendant assigns the lack of delay as error, he does not challenge the excessiveness of any of his sentences and does not allege any prejudice because of the lack of delay. Additionally, the defendant knew sentencing was going to take

place the same day his post-trial motions were heard (three and one-half months after conviction), prepared a statement to read at sentencing, and asked for a PSI to be prepared.

For the foregoing reasons, we find the trial court's failure to delay sentencing after denying the defendant's post-trial motions was harmless error.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant contends the "trial court erred in finding the state's witness [Shane Garrard] qualified as an expert in geo-positioning and allowing him to provide opinions as to the location of a phone at the time of the crime."

On March 10, 2025, the defendant filed a Motion in Limine to exclude the AT&T phone records acquired by the state. The motion alleged that the records were obtained to ascertain the defendant's cell phone location from October 4-6, 2020. In the Memorandum in Support of the defendant's Motion in Limine, the defendant claimed the phone records could not be properly authenticated because they did not contain a "Foreign Certification in accordance with La.Code Evid. art. 803.1." Additionally, the defendant asserted that the law enforcement officers who used the phone records as part of their investigation were not qualified witnesses to lay the appropriate foundation for the admittance of the phone records.

Before jury selection began, defense counsel stated the following regarding the Motion in Limine: "We had filed a Motion in Limine, and after filing the motion, the state had provided the form certificate in accordance with 803.1 of the Code of Evidence[,] rendering my argument - - my argument moot. However, we reserve our right for non-hearsay foundation objections."

At trial, the state called Shane Garrard, the Chief Information Officer for the St. Landry Parish Sheriff's Office. When the state tendered Mr. Garrard as an expert in cell phone extractions, the defendant's trial counsel stated that he had no

28

objection to "specifically the cell phone extraction." The trial court accepted Mr. Garrard as an expert in cell phone extraction.

After Mr. Garrard testified as to cell phone extraction, the state asked him to explain call detail records and how they are used by law enforcement "separate and apart from the extractions of phones." Mr. Garrard responded that call detail records can show the phone's activity and where the activity was occurring. Defense counsel asked to approach, at which time the transcript states that the court and counsel had a discussion at the bench, "but out of the hearing of the Court Reporter . . . ." The transcript indicates that after the bench conference, defense counsel asked, "Is that sustained[,]" and the trial court responded, "Yes." The state's examination continued without any indication as to what was discussed in the unrecorded bench conference.

Later, the state tendered Mr. Garrard as an expert in the "area of cell detail record and mapping analysis." Defense counsel traversed Mr. Garrard in this area. The state interrupted the traversal and asked if it could approach. The transcript indicates the court and counsel had a discussion at the bench, out of the hearing of the court reporter. The following colloquy took place immediately after the unrecorded bench conference:

> **MR. PONTIFF [Defense Counsel]:** Note my objection.
>
> **THE COURT:** All right.
>
> **MS. GOTHREAUX [Prosecutor]:** Anymore questions on that issue?
>
> **MR. PONTIFF:** No. Not on that issue.
>
> **MS. GOTHREAUX:** So, Judge, at this time, I tender him as a witness, counsel has crossed. So, I'm asking the Court to accept him as an expert in the area of call detail record mapping and analysis?
>
> **THE COURT:** All right, and - -

**MR. PONTIFF:** Note my objection.

**THE COURT:** All right. Objection is noted, and he's accepted.

Mr. Garrard was questioned by both the state and the defendant without any further objections.

To the extent that the defendant argues that the trial court erred in admitting the call detail records, we find the defendant waived that objection when, before trial, the objections raised in the pre-trial Motion in Limine were rendered moot because the state complied with the requirements of La.Code Evid. art. 803.1

The defendant claims that he objected to Mr. Garrard's testimony "as an alleged geo-location analyst and his opinions based on the call detail records from the phone company." His assignment of error refers to Mr. Garrard's lack of expertise in geo-data tracking and location. The only objection in the record by the defense is when Mr. Garrard was tendered as an expert in call detail record mapping and analysis. The trial court overruled the defendant's objection. In his testimony, Mr. Garrard used the call detail records from the phone company to determine that the SIM card associated with the defendant's cell phone number was using certain cell phone towers near the crime scene. He was also able to determine the direction from the tower, but not a precise location. Notably, the defendant did not object to the admission of the call detail records when introduced by the state at trial.

The defendant argues in its brief to this court that the testimony of Mr. Garrard is similar to the testimony of an FBI agent in *State v. Saltzman* 13-276 (La.App.3 Cir. 10/23/13), 128 So.3d 1060, *writ denied,* 14-11 (La. 6/13/14), 140 So.3d 1187, *cert. denied*, 574 U.S. 1014, 135 S.Ct. 678 (2014). We disagree. In *Salzman,* the FBI agent used more sophisticated techniques to pinpoint the exact

location of the defendant's cell phone at specific times, referred to as geo-locating. Mr. Garrard's testimony was far less specific.

Because Mr. Garrard's testimony does not reference geo-locating, we find no error in the trial court's ruling qualifying Mr. Garrard as an expert in call detail record mapping and analysis. This assignment of error lacks merit.

## CONCLUSION

The defendant's convictions and sentences for two counts of first degree murder and three counts of attempted first degree murder are affirmed. The trial court is instructed to correct the minutes of sentencing to indicate that the last sentence for attempted first degree murder was imposed on "Count 5" instead of "Count 4."

**AFFIRMED WITH INSTRUCTIONS.**